**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

William Dumont White,                     Case No. 22-CV-0988 (DSD/JFD)

                        Petitioner,

v.                                        **REPORT AND**
                                          **RECOMMENDATION**

Jesse Pugh, Warden, Rush City
Correctional Facility, Minnesota,

                        Respondent.

This case is before the Court on Petitioner William Dumont White's Petition for a
Writ of Habeas Corpus under 28 U.S.C. § 2254. (Dkt. No. 1.) The case has been referred
to the undersigned United States Magistrate Judge for a Report and Recommendation
pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. Mr. White is
represented by Zachary A. Longsdorf, Esq. Respondent Jesse Pugh is represented by Edwin
William Stockmeyer, III, Janelle Kendall, and Michael J. Lieberg, Esqs.

After a jury trial in Minnesota state district court, Mr. White was convicted of
possession of a firearm by a person convicted of a crime of violence, in violation of
Minnesota Statute § 624.713, subd. 1(2). (Pet. at 1–2.) The dispositive questions before
this Court are whether the Minnesota state courts unreasonably applied governing U.S.
Supreme Court precedent or made an unreasonable determination of fact concerning Mr.
White's petition for postconviction relief. The Court concludes that the application of U.S.
Supreme Court precedent by Minnesota's courts was not reasonable when those courts

classified as "not material" the State's failure to disclose evidence to Mr. White that it had an obligation to provide under *Brady v. Maryland*, 373 U.S. 83 (1963).

Specifically, the rule of *Brady v. Maryland* was violated when the State failed to disclose, before or during trial, that Jill Vierzba, who was the only direct witness against Mr. White, had a criminal record that rendered her ineligible for life to possess a firearm.[1] If Ms. Vierzba's criminal history had been disclosed, Mr. White could have argued to the jury that she had a motive to lie and to offer incriminating evidence against Mr. White to avoid prosecution herself. The facts giving Ms. Vierzba a motive to lie do not end with her prior conviction and lifetime ban on possession of a firearm, however. She was also on probation at the time of the offense and at the time of trial, and the State failed to disclose that. Finally, although the trial prosecutor testified in a postconviction evidentiary hearing that he knew during trial that Ms. Vierzba had a prior conviction for terroristic threats, he nevertheless elicited false testimony from Ms. Vierzba that she was "not ineligible" to possess a firearm, and he did not correct that testimony. Nor did the prosecutor correct Ms. Vierzba's testimony that she was not on probation.

In determining that the State's failure to disclose Ms. Vierzba's criminal history and probation status, and the State's use of Ms. Vierzba's testimony that the State knew to be false, was neither prejudicial nor material, the Minnesota state courts unreasonably applied

---

[1] Jill Vierzba's criminal record was found by Mr. White's research efforts in prison, then turned over to Mr. White's lawyer by Mr. White's family. It appears that it may be the case that to this day the State has not officially disclosed Ms. Vierzba's criminal record.

clearly established federal law.[2] The Court therefore recommends that a writ of habeas corpus issue, that Mr. White's conviction be set aside, and that Mr. White be released from custody unless the State of Minnesota moves to retry him within 60 days of the District Court's judgment in this case.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Mr. White's Petition raises the following grounds for habeas relief: (1) his Fifth Amendment due process rights were violated when the prosecutor failed to disclose the prior criminal convictions of the State's main witness, Ms. Vierzba; failed to disclose that her criminal history made her ineligible to possess a firearm; failed to disclose that she was on probation both at the time of the offense and at the time of trial; and used testimony that the prosecutor knew was false; (2) Mr. White's trial and appellate counsel were ineffective because they failed to discover and use Ms. Vierzba's criminal history; (3) Mr. White was improperly subjected to a custodial arrest for a misdemeanor and because he was in custody he was prevented from returning to the vehicle in which he had been a passenger, thereby depriving him of standing to challenge the search that led to the discovery of the gun; (4) Mr. White's trial was improper because there was no probable cause to hold him for trial; and (5) the state courts made several unreasonable determinations of fact. (Pet. at 4–14.)

---

[2] Mr. White raises several other grounds for relief. The Court has carefully considered all of them but does not find that any claim other than the *Brady* and *Giglio* violations entitle Mr. White to the issuance of a writ of habeas corpus.

Mr. Pugh is the named Respondent to the Petition because he is the designated person who had state custody of Mr. White when the Petition was filed. Mr. Pugh argues that the Court should deny Mr. White's Petition because the grounds for relief are either procedurally defaulted or without merit. (Resp't's Mem. Opp'n at 16, Dkt. No. 10.)

### A.    Facts Concerning Mr. White's Conviction of Unlawful Possession of a Firearm

This case began with a shooting in Saint Cloud, Minnesota. On September 19, 2017, Abigail Nystrom was alone in her grandmother's Dodge Durango, backing it out of her family's driveway, when multiple shots were fired, one of which entered the car and struck Ms. Nystrom in the right ear. (Trial Tr. Day 2, at 15, 32–33, Dkt. No. 14-2.)[3] Ms. Nystrom called her friend, Willie White, Jr.,[4] who is the son of Petitioner William White, for help, and Willie White took Ms. Nystrom to the hospital. (*Id.* at 33.) Willie White was not the person who shot Ms. Nystrom, and at the time of Mr. White's trial the shooting was still unsolved. (*Id.* at 33, 123.)

At about 11:00 p.m., Willie White telephoned his father, Mr. White, to say he had been at the hospital with Ms. Nystrom but had to leave, and asked Mr. White for a ride.

---

[3] "Trial Tr." refers to the transcript of the jury trial held on December 19–21, 2017. The original transcript is consecutively paginated, but because the transcript provided to this Court as several separate exhibits, in this Court's electronic case filing (ECF) system the transcript is separately paginated by day of trial. The Court uses the ECF-stamped page numbers that appear at the top of each page of the transcript, because the ECF numbers are more visible than the original page numbers, many of which are partially obscured by a file-stamp placed on each page of the transcript.

[4] The Court refers to Petitioner William White as "Mr. White," and his son, Willie White, Jr., as "Willie White."

(*Id.* at 171.) Mr. White did not have a car, so he asked a friend, Ms. Vierzba, for a ride. (*Id.*) Ms. Vierzba agreed to help. (*Id.* at 101, 172.) When Mr. White got into Ms. Vierzba's car,[5] Ms. Vierzba saw that Mr. White had a drink in his hand, but she did not see a firearm. (*Id.* at 102.) Mr. White got into the passenger seat of the car, and he and Ms. Vierzba went looking for Willie White. (*Id.* at 172.)

Although Ms. Nystrom did not contact law enforcement after being shot, her mother did report the shooting to the police. (*Id.* at 15, 33.) As a result, at the same time Ms. Vierzba and Mr. White were looking for Willie White, so, in separate squad cars, were Saint Cloud Police Officers Louis Bunde and Kaleb Waaraniemi. (*Id.* at 38, 66.) The officers believed Willie White might have information relevant to the investigation into the shooting of Ms. Nystrom and knew that Willie White had left the hospital on foot. (*Id.* at 38, 66.) As Mr. White and Ms. Vierzba spotted Willie White, Officer Waaraniemi also saw him walking along the road. (*Id.* at 66.) Ms. Vierzba pulled over and stopped, and Willie White began getting into the back seat of the car. (*Id.* at 67.) As Willie White was getting into the car with Ms. Vierzba and his father, Officer Waaraniemi called out to Willie White, identifying himself and telling Willie White that he wished to speak with him. (*Id.* at 67–68.) Willie White hesitated momentarily, half in and half out of the car, then turned and walked toward Officer Waaraniemi. (*Id.* at 68.) Officer Waaraniemi also noticed Mr.

---

[5] According to the testimony of Saint Cloud Police Officer Kaleb Waaraniemi, the car Ms. Vierzba was driving was registered to "another household member," but Ms. Vierzba told the officer it was her vehicle. (Trial Tr. Day 2, at 94.)

White, whom he recognized from previous contacts, in the front passenger seat of the vehicle. (*Id.* at 72.) Ms. Vierzba pulled away and parked nearby. (*Id.* at 102.)

Saint Cloud Police Officer Louis Bunde arrived soon afterwards, and he and Officer Waaraniemi pat-searched Willie White for weapons, then placed him in the back of Officer Waaraniemi's squad car. (*Id.* at 39.) Mr. White approached on foot and asked the officers why they were detaining his son. (*Id.*) After pat-searching Mr. White for weapons and finding none, Officer Bunde asked Mr. White to leave, explaining that they did not believe he was involved in their investigation. (*Id.* at 40.) Officer Bunde directed Mr. White's attention to a street sign approximately 30 yards away and told him to go stand by it. (*Id.*) Mr. White complied but, from that position, started shouting at the officers, yelling so loudly, Officer Bunde testified, that the sound of his voice echoed off nearby houses. (*Id.*) Once Officer Bunde and Officer Waaraniemi had finished speaking with Willie White, Officer Bunde went to Mr. White's location, arrested him for disorderly conduct and a noise ordinance violation, and placed him in the back seat of Officer Bunde's squad car. (*Id.* at 41.)

Officer Bunde drove Mr. White to jail after his arrest. (*Id.* at 41.)  His route took him past Ms. Vierzba's still-parked car. (*Id.* at 42.) Officer Bunde stopped his squad car, shined a light on Ms. Vierzba's car, then started to get out of his squad car to approach Ms. Vierzba's car. (*Id.* at 42.) Officer Bunde testified that Ms. Vierzba "flung open" her door as he approached and got out of the car, which he testified was unusual behavior; most people he approaches either roll down their window or wait for the officer to give them instructions. (*Id.* at 42-43.) Both Officer Bunde and Officer Waaraniemi (who arrived at

the car after Officer Bunde) testified to a powerful aroma of marijuana coming from the car. (*Id.* at 43, 73.)[6] Officers Bunde and Waaraniemi asked Ms. Vierzba for consent to search her vehicle. (*Id.* at 73.) Ms. Vierzba claimed the officers were rude, threatened that she would go to jail and her car would be impounded, and because they told her they had probable cause she "just did what I was told." (*Id.* at 103, 112, 114.) Officer Bunde testified, to the contrary, that from the outset Ms. Vierzba was "extremely cooperative" and that she consented to the officers searching her car. (*Id.* at 43.) In the glovebox, Officer Waaraniemi found a partially-loaded, stolen, Glock, semi-automatic pistol with a partially scratched-off serial number. (*Id.* at 44, 73, 76.) Officer Bunde characterized Ms. Vierzba's reaction to the gun's discovery as being "very upset. She was very clearly visibly upset." (*Id.* at 62.)

Ms. Vierzba testified that when the police opened the glovebox she recognized everything in it as hers, except the gun, which she testified she had never seen before. (*Id.* at 104, 107.) Ms. Vierzba told the jury that the gun had not been there when she had last opened the glovebox, which she testified had been either the day before or that morning. (*Id.* at 105.) Nobody but Ms. Vierzba and her daughter had access to the car. (*Id.* at 105, 117.)

Ms. Vierzba testified that she did not see Mr. White with a firearm when he got into the car, although he was carrying a drink. (*Id.* at 102.) She stated she never saw Mr. White put the gun in the glovebox. (*Id.* at 104.) In response to the prosecutor's question on direct

---

[6] During the later search of the car that revealed the gun, no marijuana was found. (Trial Tr. Day 2, at 55.) There is no evidence in the record that the police ever tested Ms. Vierzba for marijuana. Mr. White testified at trial that he was tested for marijuana, with negative results. (Trial Tr. Day 2, at 181.)

examination, Ms. Vierzba testified that she was not barred from owning a firearm: "Q: Are you prohibited from possessing a firearm? A: No." (*Id.* at 106.) At the time he asked this question, the prosecutor knew that Ms. Vierzba had a prior conviction for terroristic threats, a crime of violence under Minnesota law. (Postconviction Evid. Hr'g Tr. Day 1, at 31, Dkt. No. 14-5.) The prosecutor later agreed, when he testified in a state postconviction evidentiary hearing, that if Ms. Vierzba's terroristic threats conviction resulted in her having a lifetime ban on firearm possession, then she could have been charged with exactly the same crime as Mr. White. (*Id.* at 31–33.) One of the collateral consequences of a conviction like Ms. Vierzba's is a lifetime ban on possessing a firearm. (*Id.*)

On cross-examination by Mr. White's lawyer at trial, Ms. Vierzba testified that she had told the police she swore on her dead mother's grave that she never saw Mr. White with a gun. (*Id.* at 112.) Ms. Vierzba also testified that even if she had not been looking, she would still have heard an audible "click" sound if the glovebox had been opened or closed. (*Id.*) She did not hear such a click. (*Id.*) Ms. Vierzba also testified that when the police wanted a DNA sample from her, they told her they would "go through your probation" if necessary. (*Id.* at 113.) Ms. Vierzba stated at trial, "I'm not on probation." (*Id.*) The prosecutor did not correct this testimony.

On redirect examination, in response to a question from the prosecutor, Ms. Vierzba conceded it was possible that while she was distracted by Officer Waaraniemi's efforts to get Willie White's attention the glovebox could have been opened and closed without her noticing. (*Id.* at 115.) She then agreed with the prosecutor that only Mr. White could have put the gun in the glovebox. (*Id.* at 109.) There was little to no evidence that corroborated

8

this conclusion. The gun and its magazine were dusted for fingerprints but no fingerprints suitable for comparison were found. (*Id.* at 151.) Officer Waaraniemi did not try to collect fingerprints from the glovebox itself because, he testified, the pebbly surface of the car's dash was "not conducive for obtaining fingerprints." (*Id.* at 94.) DNA was collected from several points—the grip, the slide, and the magazine—on the gun, as well as on several rounds of ammunition, then compared to known samples from Mr. White and Ms. Vierzba. (*Id.* at 145, 147.) Because there was DNA from at least five individuals on the grip and the slide, the DNA mixture was too complex to allow the Bureau of Criminal Apprehension Laboratory to compare the DNA from those locations to Mr. White or Ms. Vierzba. (*Id.* at 150.) The DNA collected from the magazine was suitable for comparison, but all that could be said was that approximately half the world's population (including both Mr. White and Ms. Vierzba) could have contributed the DNA and the other half could not. (*Id.* at 149-150.) There was too little DNA on the ammunition for the laboratory to work with. (*Id.* at 151.)

Officer Waaraniemi, who searched Ms. Vierzba's car, testified that Mr. White, as the front seat passenger, was within two or three feet of the glovebox. (*Id.* at 76.) In response to defense counsel's question, "It's possible that gun in the vehicle could have been hers? Is it possible?" Officer Waaraniemi replied, "Not according to the investigation that was completed." (*Id.* at 93.) Asked to explain what "the investigation that was completed" actually consisted of, Officer Waaraniemi replied, "The investigation completed was that a firearm located in proximity to the defendant and the individual operating the vehicle providing a statement stating that he was the only individual that

would have been physically capable of placing the firearm in that location." (*Id.* at 93–94.) In response to further questions, Officer Waaraniemi then conceded that Ms. Vierzba was also physically capable of placing the gun in the glovebox and that it was possible it was her gun "if the information she provided us was incorrect." (*Id.* at 94.)

Mr. White testified in his own defense and stated that he did not own the gun in the glovebox, had not seen the gun, and had not gone into the glovebox. (*Id.* at 182.) Mr. White stated that he had not seen the firearm until it was displayed in court at his trial. (*Id.* at 184.) Mr. White also testified that he believed the police had planted the gun and then destroyed body-worn camera video footage that would have shown that. (*Id.* at 194.)

In his closing argument, the prosecutor referred to Ms. Vierzba's testimony that she was not ineligible to possess a firearm (Trial Tr. Day 3, at 25, Dkt. No. 16[7]; *see* Resp't's App. Ex. 7 at 13 & n.2, Dkt. No. 11-7), while Mr. White's attorney argued to the jury that the gun could be Ms. Vierzba's (*id.* at 37–38, 42, 43). Counsel also argued more generally to the jury that the gun could "belong to someone else." (*Id.* at 38.) Counsel pointed out that Mr. White had cooperated in the collection of a DNA sample, while Ms. Vierzba had

---

[7] The transcript of this portion of the prosecutor's closing argument reads "you know Jill [Vierzba] testified she's *now* prohibited, she's never had a firearm, it's not hers." (Trial Tr. Day 3, at 25) (emphasis added).) The Court agrees with Mr. White (*see* Pet. at 5 n.1) and finds that the word transcribed as "now" should be "not." The Court makes this finding because if the prosecutor used the word "now" it would be a reversal of an important part of the prosecution's case, would contradict Ms. Vierzba's testimony, and would probably have drawn a reaction from the judge, the defense lawyer, or both. No such reaction appears on the transcript. Following Mr. White's counsel's assertion that "now" should be "not" Respondent replied to the Petition without contesting Mr. White's interpretation of this word.

to be hounded before supplying a sample. (*Id.* at 40.) Counsel also pointed out that after Mr. White got out of the car to speak to the police, Ms. Vierzba was alone in the car for 20 to 30 minutes. (*Id.* at 42-43.) Counsel told the jury "it's reasonable to believe it could be Ms. Vierzba's." (*Id.* at 44.)[8]

The jury found Mr. White guilty (Trial Tr. Day 3, at 59), and he was sentenced to 180 months' imprisonment (*see* Pet. at 1; Sentencing Tr. at 23, Dkt. No. 14-4).

### B.   Mr. White's Direct Appeal

In Mr. White's direct appeal to the Minnesota Court of Appeals, he argued (1) there was insufficient evidence that he possessed the firearm; (2) the police unlawfully expanded the scope of Mr. White's misdemeanor arrest by detaining him while they searched Ms. Vierzba's vehicle; (3) Mr. White's Fourth Amendments rights were violated by the search of the car, because it was not supported by reasonable suspicion or any other, constitutionally-adequate justification; (4) Mr. White's arrest was unlawful under Minnesota Rule of Criminal Procedure 6.01; (5) the 180-month sentence was excessive; (6) the prosecutor engaged in misconduct by failing to disclose exculpatory evidence concerning Officer Waaraniemi; (7) the trial court erred by not instructing the jury on

---

[8] Trial defense counsel testified at the postconviction evidentiary hearing that in briefs filed in connection with a motion to suppress, she had asserted it was possible that Ms. Vierzba carried a gun at all times for protection, and that it was possible Ms. Vierzba placed the gun in the glovebox when she saw Mr. White speaking with law enforcement. (Postconviction Evid. Hr'g Tr. Day 1, at 59, Dkt. No. 14-5.) Those briefs were not made a part of the record for this federal habeas corpus proceeding.

accomplice testimony[9]; (8) the jury engaged in misconduct by pressuring a juror; and (9) Mr. White's out-of-state convictions were not felonies. (*See* Resp't's App. Ex. 1, Dkt. No. 11-1; Ex. 2, Dkt. No. 11-2.)

The Minnesota Court of Appeals affirmed the district court in all respects. *State v. White*, No. A19-0307, 2020 WL 132523, at *6 (Minn. Ct. App. Jan. 13, 2020) ("*White I*"). Relevant here, the court recounted the evidence at trial that showed Mr. White constructively possessed the firearm: Mr. White sat in the passenger seat of Ms. Vierzba's car, closest to the glovebox; Ms. Vierzba consented to the search of her car and was surprised when the police found a gun in the glovebox; Ms. Vierzba testified that she did not recognize the gun, did not own a gun, and did not see the gun in the glovebox when she looked in it earlier that day; and only Ms. Vierzba had keys to the car. *Id.* at *2. The appellate court rejected Mr. White's theory that Ms. Vierzba possessed the gun, noting that "[t]he jury *could have* inferred that [Ms. Vierzba] possessed the gun by virtue of its presence in her vehicle . . . . But because that inference is inconsistent with the circumstances proved, we presume that the jury ultimately rejected it in favor of [Ms. Vierzba's] testimony . . . ." *Id.* (emphasis in original). At the time of Mr. White's initial appeal, the withheld *Brady* material still had not been disclosed. The court of appeals

---

[9] As explained below, at the time of the direct appeal, the facts from which a jury could find that Ms. Vierzba was an accomplice were known only to the prosecution, which had not disclosed them to the defense. The defense nevertheless argued, based on the facts adduced at trial, that Ms. Vierzba could have been convicted of having an uncased firearm in a motor vehicle. That is not the same crime with which Mr. White was charged.

therefore wrote about the jury believing Ms. Vierzba's testimony without knowing that the jury had not received evidence that was important to assessing Ms. Vierzba's credibility.

The Minnesota Court of Appeals also considered Mr. White's argument that Ms. Vierzba's testimony was "untrustworthy" and "could not be used to convict appellant without independent corroboration because of her self-interest in avoiding prosecution for unlawful firearm possession." *Id.* at *3. In rejecting this argument, the court of appeals took specific note of Ms. Vierzba's testimony "*that she was not then disqualified from possessing a firearm.*" *Id.* (emphasis added). Citing *State v. Larson*, 787 N.W.2d 592, 602 (Minn. 2010),[10] the court then stated that "there is no indication that [Ms. Vierzba] 'could have reasonably been charged with and convicted of aiding and abetting the crime at issue'—possession of a firearm by an ineligible person—such that she would be considered an accomplice." *White I*, 2020 WL 132523, at *3. Rather, the court concluded, Mr. White's

---

[10] *Larson* held that "when an accomplice testifies in a criminal trial," the court must instruct the jury that a conviction cannot be based on the uncorroborated testimony of an accomplice. 787 N.W.2d at 602. "An accomplice instruction must be given if a witness could have reasonably been charged with and convicted of aiding and abetting the crime at issue." *Id.* "The rationale for this rule is that the credibility of an accomplice is inherently untrustworthy." *State v. Evans*, 756 N.W.2d 854, 877 (Minn. 2008) A Minnesota district court must give an accomplice testimony instruction "in any criminal case in which it is reasonable to consider a witness against the defendant to be an accomplice." *Id.* A judge must give an accomplice testimony instruction when appropriate, even if the defendant does not request it. *Larson*, 787 N.W. 2d at 602 ("Such an instruction must be given, whether requested or not, when an accomplice testifies in a criminal trial"). However, when a defendant claims a witness is an alternative perpetrator—someone who committed the crime instead of the defendant, not in conjunction with the defendant—"that witness is not an accomplice as a matter of law, and an accomplice instruction is not required." *Larson,* 787 N.W. 2d at 602. *See also State v. Swanson*, 707 N.W.2d 645, 877 (Minn. 2008) ("a witness who is alleged to have committed the crime *instead* of the defendant is, as a matter of law, not an accomplice" (emphasis in original)).

theory cast Ms. Vierzba "as an alternative perpetrator, which undercuts his attempt to render her testimony not credible as a matter of law." *Id.*

Mr. White sought review by the Minnesota Supreme Court, raising the following arguments: (1) the 180-month sentence was excessive; (2) he had standing to challenge the vehicle search; (3) his arrest was unlawful under Minnesota Rule of Criminal Procedure 6.01; (4) there was insufficient evidence that he possessed the firearm; (5) the jury committed misconduct; and (6) his out-of-state convictions were not felonies. (Resp't's App. Ex. 6, Dkt. No. 11-6.) The Minnesota Supreme Court denied review on March 25, 2020. (*See* Pet. at 3.)

### C.    Ms. Vierzba's Criminal History

Meanwhile, in February 2020, through his own efforts from within prison, Mr. White learned about Ms. Vierzba's criminal history. (Postconviction Evid. Hr'g Tr. Day 1, at 105); *see also White v. State*, No. A21-0423, 2021 WL 5441783, at *2 (Minn. Ct. App. Nov. 22, 2021) ("*White II*"). Mr. White learned that, at the time of his trial, Ms. Vierzba had a conviction for terroristic threats, six convictions for theft, and one DWI. (*See* Resp't's App. Ex. 7 at 18, Dkt. No. 11-7.) Ms. Vierzba's terroristic threats conviction meant she was ineligible, for life, to possess a firearm. [11] (*See* Pet. Ex. B at 14, Dkt. No. 1-1.) Records

---

[11] Ms. Vierzba was convicted of making terroristic threats in 2000 and sentenced under a stay of imposition. (*See* Pet. Ex. B at 14, Dkt. No. 1-1; Pet'r's Ex. 2 at 23, Dkt. No. 4.) She was discharged from probation on that conviction on June 25, 2002, and advised she was prohibited from possessing a firearm for ten years from that date. (Pet. Ex. B at 14.) In 2003, the relevant statute (Minn. Stat. § 624.713) was amended and "increased the ban from ten years to a lifetime." *State v. Ryks*, No. A08-126, 2009 WL 1515516, at *1 (Minn. Ct. App. June 2, 2009).

14

obtained by Mr. White also confirmed that Ms. Vierzba was on probation for the DWI conviction and one theft conviction at the time of his trial. (*See* Resp't's App. Ex. 7 at 19.)

### D.    Mr. White's Postconviction Petition and the Evidentiary Hearings

On July 21, 2020, Mr. White filed a petition for postconviction relief in Stearns County District Court. (Pet. at 3; Resp't's App. Ex. 7, Dkt. No. 11-7.) Mr. White argued that he had discovered new evidence, namely several criminal convictions of Ms. Vierzba, that the prosecution had not disclosed before or during trial in violation of *Brady*. (Resp't's App. Ex. 7 at 2.) Mr. White also challenged his arrest and detention as in violation of Minnesota Rule of Criminal Procedure 6.01; claimed that his trial counsel was ineffective for not discovering and using Ms. Vierzba's criminal history and not raising his Rule 6.01 argument; and asserted that his appellate counsel was ineffective for not discovering Ms. Vierzba's criminal history and not making *Brady*, false-evidence, and ineffective-assistance-of-trial-counsel arguments. (*Id.* at 3.) The postconviction court conducted an evidentiary hearing on Mr. White's postconviction petition on December 11, 2020 and January 6, 2021.

At that hearing, the trial prosecutor testified that he had been assigned to prosecute Mr. White's case "[i]mmediately prior to trial" and did not know whether Ms. Vierzba's criminal history had been disclosed. (Postconviction Evid. Hr'g Tr. Day 1, at 27, 29.) The prosecutor acknowledged that the case file showed that the defense had made at least one, possibly two, written requests for a record of the criminal convictions, if any, of the State's witnesses, and that Jill Vierzba was on the State's witness list (as well as the defense's). (*Id.* at 28–29, 34.) He was not able to check the status of disclosures because, he testified,

the Stearns County Attorney's Office had no office-wide policy on the disclosure of *Brady* or *Giglio* material. (*Id.* at 30.) When asked whether a record of disclosures would be found in the case file, the trial prosecutor responded, "It's possible." (*Id.* at 29.) The trial prosecutor did not disclose Ms. Vierzba's criminal history because "I would guess it was disclosed, if it was a witness criminal history, as part of the initial reports." (*Id.* at 30.) The trial prosecutor testified that he personally checked Ms. Vierzba's criminal history before trial, knew that she had a terroristic threats conviction, and "likely would have known" that Ms. Vierzba was on probation for a "DUI" at the time of trial. (*Id.* at 31.)

The trial prosecutor stated that evidence of Ms. Vierzba's conviction was not favorable to Mr. White (and so, presumably was not *Brady* material that had to be disclosed). By way of explanation, he testified that he did not believe the 2003 change to a lifetime ban was meant to apply retroactively. (*Id.* at 32.) Mr. White's counsel then asked whether it was true that the statute itself said it applies retroactively back to 1993. (*Id.*) The prosecutor answered, "I was not of that opinion." (*Id.*) Perhaps noting the use of the past tense, the prosecutor was then asked whether he was of that opinion now. He answered that he had not investigated that "due to the fact that I've been subpoenaed as a witness."[12] Because Ms. Vierzba's terroristic threats conviction "was sentenced and discharged prior to the 2003 change, . . . it didn't have – in our interpretation didn't have any impact." (*Id.* at 40–41.) The trial prosecutor testified that "if that statute worked retroactively and the

---

[12] Why being subpoenaed means one cannot read statutes in preparation for one's testimony was left unexplored.

person I believe had notice of that" then he would "probably" agree that Ms. Vierzba's conviction carried a lifetime firearms possession ban. (*Id.* at 33.) The trial prosecutor also testified that Ms. Vierzba told him she was not ineligible to possess a firearm and that he believed her (*id.* at 37) because "looking at it, I also believed that she was not" (*id.* at 43).[13] Turning to a different mechanism of admissibility, the trial prosecutor also did not believe, because of the conviction's age, that it was disclosable as evidence that could potentially

---

[13] The trial prosecutor was wrong as to both retroactivity and notice. First, the lifetime ban on possession of a firearm applied to Ms. Vierzba even though her terroristic threats conviction was discharged before the statute was amended in 2003. The plain text of the amendment reads, "the lifetime prohibition on possessing . . . firearms . . . for persons convicted or adjudicated delinquent of a crime of violence in clause (2) applies only to offenders who are discharged from sentence or court supervision for a crime of violence on or after August 1, 1993." Minn. Stat. § 624.713(13). Ms. Vierzba was convicted of terroristic threats in 1999. (Postconviction Evid. Hr'g Tr. Day 1, at 60.) She was discharged from probation on that conviction on June 25, 2002. (Pet. Ex. B at 14.) Second, lack of notice to Ms. Vierzba that her ban had changed from ten years to life does not affect the State's ability to prosecute her for violating this statute. Minn. Stat. § 624.713, subd. 3(a). *See also State v. Grillo*, 661 N.W.2d 641, 645 (Minn. Ct. App. 2003) (conviction of firearm possession by an ineligible person upheld, notwithstanding lack of notice to defendant that his conviction of motor vehicle theft had been statutorily reclassified, two years after his conviction, as a crime of violence). Finally, the trial prosecutor also mentioned, in connection with the validity of Ms. Vierzba's conviction, a "stay of imp." (*Id.* at 41.) Ms. Vierzba was granted a stay of imposition by the sentencing court. "A 'stay of imposition' occurs when the court accepts and records a finding or plea of guilty, but does not impose (or pronounce) a prison sentence. If the offender successfully completes the stay, the case is discharged, and the conviction is deemed a misdemeanor. . . ." Minn. Sent. Guidelines, 1.B.19(a). While Minn. Stat. § 624.712, subd. 5's definition of "crime of violence" is limited to felonies, for purposes of the firearm prohibition, what controls is the fact that the original conviction was for a felony. *State v. Moon*, 463 N.W.2d 517, 521 (Minn. 1990) (for purposes of firearm prohibition, crime of conviction controls, not subsequent treatment of that crime). That Ms. Vierzba currently has a misdemeanor on her criminal history, not a felony, therefore has no effect on her lifetime firearms ban.

be used for impeachment of Ms. Vierzba under Minnesota Rule of Evidence 609. (*Id.* at 45.)[14]

The trial prosecutor did state that if Ms. Vierzba was ineligible to possess a firearm at the time of Mr. White's arrest, she could have been charged with the same crime as Mr. White. (*Id.* at 33). He also agreed that being ineligible to possess a firearm would make a person less likely to claim possession of a gun if one were discovered and that the same was true of being on probation. (*Id.* at 41–42.)

Mr. White's trial counsel testified that she did not receive Ms. Vierzba's criminal history from the prosecution. (Postconviction Evid. Hr'g Tr. Day 1, at 56.) Even if she had known of Ms. Vierzba's record, she would not have aggressively cross-examined Ms. Vierzba because she wanted Ms. Vierzba to testify that she had not seen Mr. White with a firearm, had not seen Mr. White open the glovebox, and had not heard the "click" of the glovebox being opened and closed. (*Id.* at 62–63.) When asked about points in the trial when she had suggested that the gun could have belonged to Ms. Vierzba, trial defense counsel characterized those instances as partly one component of an overall trial strategy of pointing out that there were several other people who could have possessed the gun, leading the jury to conclude there was reasonable doubt that Mr. White possessed the gun, and partly an effort to criticize law enforcement's investigation. (*Id.* at 67–68.) Trial defense counsel testified that she was also seeking to preserve Ms. Vierzba's credibility

---

[14] Mr. White appears to agree with this assessment. Mr. White has not claimed that he would have used Ms. Vierzba's terroristic threats conviction, had he known of it, to impeach her pursuant to Minnesota Rule of Evidence 609.

because of the statements she had made supportive of Mr. White's case, such as her assertion that she never saw Mr. White with a gun and that she never saw or heard the glovebox being opened. (*Id.* at 65.) Counsel was also concerned that if Ms. Vierzba were confronted she might change some of her supportive statements. (*Id.* at 91.) Finally, counsel also characterized as "a tough sell" a trial strategy of arguing that reasonable doubt existed because of the possibility that Ms. Vierzba possessed the gun, given how she reacted when the police found the gun. (*Id.* at 100.) Mr. White testified that had he known of Ms. Vierzba's criminal record, he would not have hired a lawyer to represent him who would not promise to use Ms. Vierzba's criminal record.[15] (*Id.* at 107.)

On the second day of the postconviction evidentiary hearing, Saint Cloud Police Officer Christopher Voth testified that, during the investigation of Mr. White, he may have threatened Ms. Vierzba that he would contact her probation officer to convince her to cooperate. (Postconviction Evid. Hr'g Tr. Day 2, at 49, Dkt. No. 14-6.) Officer Voth checked her criminal record through either a public website or the statewide supervision website and believed she may have been on probation. (*Id.* at 50, 55.)

On March 15, 2021, the postconviction court issued an order concerning Mr. White's request to reopen the omnibus proceeding to make a probable cause challenge based on Ms. Vierzba's criminal history (Pet. Ex. A, Dkt. No. 1-1.) Writing separately on Mr. White's claim that his lawyers were ineffective because they failed to assert a violation of Rule 6.01, the postconviction court found the conduct of both trial and appellate counsel

---

[15] Mr. White's trial defense counsel was privately retained. (Postconviction Evid. Hr'g Tr. Day 1, at 56.)

reasonably effective, under *Strickland v. Washington*, 366 U.S. 668 (1984). (Pet. Ex. A at 7–8.) The postconviction court further found that the outcome of the trial or appeal would not have changed if the Rule 6.01 argument had been made. (*Id.* at 8.)

On March 18, 2021, the postconviction court issued a formal order on the postconviction petition. (Pet. Ex. B, Dkt. No. 1-1.) The court deemed the Rule 6.01 claim waived and denied the ineffective-assistance-of-appellate-counsel claim under *Strickland*. (*Id.* at 26–27.) The postconviction court found the *Brady* and ineffective-assistance-of-trial-counsel claims intertwined and considered them together. (*Id.* at 27–35.) The State conceded, and the court agreed, that "the State violated *Brady* by failing to disclose the criminal history of Jill Vierzba." (*Id.* at 27.) But the court found postconviction relief was not warranted because Mr. White either did not show that the nondisclosed evidence was favorable to him (in most cases because the court had doubts about the admissibility of the evidence) or that the failure to disclose it caused prejudice. (*Id.* at 28–34.) The court emphasized that Mr. White and his trial counsel agreed upon a defense strategy, which relied heavily on having Ms. Vierzba be a favorable witness. (*Id.* at 29.) The postconviction court reiterated that Mr. White's trial and appellate counsel were not ineffective, because their conduct in representing him was objectively reasonable and Mr. White had not shown the outcome of the trial or appeal would have been different absent the alleged errors. (*Id.* at 34–37.)

### E.    Mr. White's Appeal of the Denial of Postconviction Relief

Mr. White appealed the denial of postconviction relief to the Minnesota Court of Appeals. The issues presented for review were (1) the *Brady* and *Giglio* claims, (2) the

ineffective-assistance-of-counsel claims, and (3) the Rule 6.01 and probable-cause-for-arrest claims. (Resp't's App. Ex. 9 at 5–6, Dkt. No. 11-9.)

The Minnesota Court of Appeals affirmed the denial of postconviction relief on November 22, 2021. *White II*, 2021 WL 5441783, at *1. Particularly relevant to the *Brady* claim before this Court, the state appellate court concluded that the prosecution's failure to disclose the terroristic threats conviction did not prejudice Mr. White because officer testimony "established that White was positioned in the vehicle directly in front of the glovebox where the gun was found, that [Ms. Vierzba] consented to a search of her car, and that [Ms. Vierzba] was visibly upset and appeared surprised to learn there was a gun in her glovebox." *Id.* at *5. This evidence, the appeals court found, corroborated Ms. Vierzba's testimony. *Id.* The court explicitly declined to reconsider the *White I* panel's determinations that Mr. White was "the only person with access to the glove box and an opportunity to place the gun there" and that Mr. White's arguments about Ms. Vierzba's lack of trustworthiness and potential accomplice status lacked merit. *Id.* at *4 (citing the "law-of-the-case doctrine"). Finally, even if the terroristic threats conviction had been disclosed, the court continued, it would not have "*disprove[d]* that White possessed the gun." *Id.* at *5 (emphasis in original).

Moving to Ms. Vierzba's misdemeanor theft convictions, the Minnesota Court of Appeals determined these convictions had no impeachment value because a simple theft conviction is not a crime involving dishonesty. *Id.* The convictions also had no value as alternate-perpetrator evidence because the record did not establish that the prior thefts were sufficiently similar to the charged offense. *Id.* at *6. With respect to Ms. Vierzba's

21

probation status, the court of appeals acknowledged that she "was on probation to the court for two different offenses" and characterized her testimony that she was not on probation as "not entirely accurate." *Id.* Nevertheless, the court of appeals rejected Mr. White's claim that he was prejudiced by the nondisclosure because—as the court phrased it—"White makes no argument that there is a reasonable probability that the outcome of the trial would have been any different." *Id.*

Mr. White sought review by the Minnesota Supreme Court on the following issues: (1) whether his due process rights were violated by the prosecution's failure to disclose Ms. Vierzba's criminal history, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972); (2) whether his trial and appellate counsel were ineffective for failing to identify and use Ms. Vierzba's criminal history; and (3) whether his Rule 6.01 and probable-cause arguments had been waived or lacked merit. (Resp't's App. Ex. 15 at 2, Dkt. No. 11-15.) The Minnesota Supreme Court denied review on February 15, 2022. (Pet. Ex. D, Dkt. No. 1-1.)

## II.    LEGAL STANDARDS

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs a federal court's review of habeas petitions filed by state prisoners. *See* 28 U.S.C. § 2254. The AEDPA states that federal courts shall entertain a habeas corpus petition on "behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "This is a very deferential standard." *Zaldivar-Proenza v. Bolin*, No. 21-

CV-1231 (KMM/JFD), 2022 WL 16833825, at *2 (D. Minn. Nov. 9, 2022) (citing *Harrington v. Richter*, 562 U.S. 86, 102 (2011) ("If this standard is difficult to meet, that is because it was meant to be.")).

A habeas petition can be granted on a claim that was adjudicated by the state courts on the merits only if the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"A state court decision is 'contrary to' clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court reaches the opposite result in a case involving facts that are materially indistinguishable from relevant Supreme Court precedent." *Smith v. Titus*, 958 F.3d 687, 691 (8th Cir. 2020) (citing *Williams v. Taylor*, 529 U.S. 362, 405 (2000)), *cert. denied*, 141 S. Ct. 982 (2021). "A legal principle is 'clearly established' . . . only when it is embodied in a holding of [the Supreme] Court." *Thaler v. Haynes*, 559 U.S. 43, 47 (2010).

A state court unreasonably applies Supreme Court precedent when it "correctly identifies the governing legal standard but either unreasonably applies it to the facts of the particular case or unreasonably extends or refuses to extend the legal standard to a new context." *Munt v. Grandlienard*, 829 F.3d 610, 614 (8th Cir. 2016) (citing *Williams*, 529 U.S. at 407). "An 'unreasonable application' is different from an incorrect or erroneous

23

application; a prisoner must establish that a state court's adjudication was not only wrong, but also objectively unreasonable, such that 'fairminded jurists' could not disagree about the proper resolution." *Smith*, 958 F.3d at 691. In reviewing a habeas petition, federal courts may not find that a state court reached the wrong conclusion simply because, in the federal court's independent judgment, it "would have applied federal law differently from the state court." *Rousan v. Roper*, 436 F.3d 951, 956 (8th Cir. 2006) (citation omitted).

## III.    DISCUSSION

### A.    *Brady*, *Giglio*, and Due Process

Mr. White contends his Fifth Amendment due process rights were violated because the prosecution violated *Brady* and *Giglio* in two separate ways. First, although his lawyer twice requested that the prosecution disclose exculpatory evidence,[16] the State did not disclose the criminal history of its main witness, Ms. Vierzba. Mr. White learned only after his direct appeal that Ms. Vierzba had a prior conviction for terroristic threats, which made her ineligible to possess a firearm. (Pet. at 5, 8.) Mr. White also learned that Ms. Vierzba was on probation at the time of the offense and the trial, and that Ms. Vierzba had multiple misdemeanor convictions including theft, driving under the influence, and drug possession, none of which had been disclosed by the prosecution. (*Id.*) Second, according to Mr. White,

---

[16] Minnesota Rule of Criminal Procedure 9.01 requires disclosure, at the defense's request, of a number of items of information, among them the "record of convictions, if any, within the prosecutor's actual knowledge," Minn. R. Crim. P. 9.01, subd. 1(1)(a), and "[m]aterial or information in the prosecutor's possession and control that tends to negate or reduce the defendant's guilt," Minn. R. Crim. P. 9.01, subd. 6. Before trial, Mr. White's defense counsel sent the prosecutor two written requests for disclosure of material encompassed within Rule 9, including the record of convictions of the State's witnesses and exculpatory information.

the State also elicited false testimony from Ms. Vierzba that she was not prohibited from possessing a firearm and was not on probation. (*Id.* at 6.)

In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court held that the prosecution violates the Constitution's due process clause "if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." *Turner v. United States*, 582 U.S. 313, 315 (2017) (quoting *Smith v. Cain*, 565 U.S. 73, 75 (2012) (summarizing the holding of *Brady* )). That the prosecution acted in good faith does not mitigate the violation. "Under *Brady v. Maryland*, suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *United States v. Pendleton*, 832 F.3d 934, 940 (8th Cir. 2016) (cleaned up). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 282 (1999).

On postconviction review, the State conceded that the first two components had been met, and thus, the state courts addressed only the component of prejudice. *See White II*, 2021 WL 5441783, at *4. "Prejudice results if the suppressed evidence is material." *Kennell v. Dormire*, 873 F.3d 637, 639 (8th Cir. 2017). Evidence is "material" only when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667,

682 (1985). A "reasonable probability" is one "sufficient to undermine confidence in the outcome" of the trial. *Id.*

### 1.    Nondisclosure of Ms. Vierzba's Conviction for Terroristic Threats and Ineligibility to Possess a Firearm

In his appeal from the district court's denial of postconviction relief, Mr. White argued to the Minnesota Court of Appeals that he could have used Ms. Vierzba's conviction for terroristic threats (1) to show that Ms. Vierzba was ineligible to possess a gun and was therefore motivated to lie about its possession and ownership and (2) to request an accomplice-corroboration instruction at trial. (Resp't's App. Ex. 9 at 27–28, 35–36, 41.) The *White II* panel of the Minnesota Court of Appeals began its consideration of these arguments by "first observ[ing] that White asserted essentially the same arguments in his first appeal." *White II*, 2021 WL 5441783, at *5. The appellate court then used the "law-of-the-case doctrine" to decline to address this argument, writing that "[b]ecause we have already determined that the circumstances proved showed that White 'was the only person with access to the glove box and an opportunity to place the gun there,' and that White's arguments about [Ms. Vierzba's] untrustworthiness and potential consideration as an accomplice were unmeritorious, we do not reexamine such issues on a second appeal of the same case." *Id.* (quoting *White II*, 2020 WL 132523, at *3.) The court of appeals appears to be saying that the *Brady* violation was already somehow prejudged and found not material in an earlier opinion that was *written before the* Brady *violation's existence was known*, and thus, the court need not, indeed could not, consider Mr. White's arguments made for the first time in his postconviction petition. In addition, the court of appeals

26

quoted only Ms. Vierzba's trial testimony as evidence for the proposition that Mr. White alone could have placed the gun in the glove box, without noting that the undisclosed *Brady* material would have gone directly to the jury's perception of the veracity of that testimony, or that Mr. White's challenges to Ms. Vierzba's "untrustworthiness and consideration as an accomplice" might, with the *Brady* material included in the analysis, now be meritorious.

Throughout the postconviction proceedings, the State never contested that Ms. Vierzba's criminal history should have been disclosed but was not. Respondent concedes the same in this habeas proceeding. Thus, the only question is whether Ms. Vierzba's prior conviction is material.

In *White II*, the Minnesota Court of Appeals declined to reconsider a determination it believed had already been made in *White I*. To understand precisely what the court of appeals meant, this Court revisits *White I*. In that opinion, the court of appeals rejected Mr. White's arguments that Ms. Vierzba was untrustworthy and had a "self-interest in avoiding prosecution for unlawful firearm possession." *White I*, 2020 WL 132523, at *3. The court acknowledged Mr. White's argument that Ms. Vierzba was an alternate perpetrator, but then spurned that argument as inconsistent with Mr. White's argument that Ms. Vierzba could be considered an accomplice. *Id.* When the court of appeals in *White II* stated that Mr. White's arguments about Ms. Vierzba's trustworthiness and potential as an accomplice had been found "unmeritorious" in *White I*, the court neglected to say that arguments were deemed unmeritorious only because without the withheld *Brady* material it appeared to the *White I* panel that Ms. Vierzba could not have been charged with the same crime with

27

which Mr. White was charged (unlawful possession of a firearm) and therefore took at face value Ms. Vierzba's assertion when she  "testified that she was not then disqualified from possessing a firearm." *See White I*, 2020 WL 132523, at *3. The information available to the *White I* panel did not include the withheld *Brady* material. It was unreasonable for the *White II* panel to assert that it was barred by the law-of-the-case doctrine from revisiting a determination made by the *White I* panel that Mr. White's claim had been deemed "unmeritorious" when the premise of that determination—that Ms. Vierzba could legally possess a firearm—was known by the time of *White II* to be false.

At two points in its Response, Respondent asserts that the Minnesota Court of Appeals in *White II* found Ms. Vierzba's testimony to be corroborated. The *White II* panel found that "the officers' testimony established that White was positioned in the vehicle directly in front of the glove box where the gun was found, that [Ms. Vierzba] consented to a search of her car, and that [Ms. Vierzba] was visibly upset and appeared surprised to learn there was a gun in her glovebox." *White II*, 2021 WL 5441783, at *5. From this, the *White II* panel continued, again, to ratify the holding of the *White I* panel, rather than consider the materiality of the evidence in light of the newly discovered information about Ms. Vierzba's criminal history:

> The conclusions drawn from these circumstances proved remain the same— that White exercised "dominion and control over the gun by hiding it in [Ms. Vierzba's] glovebox" and that White "was the only person who could have placed the gun in the glove box; he did so without [Ms. Vierzba's] knowledge or consent; and he left the vehicle only after directing [Ms. Vierzba] to 'stay there' while he talked to the police."

*White II*, 2021 WL 5441783, at *5 (quoting *White I*, 2020 WL 132523, at *3). The "conclusions drawn," including, critically, the assertion that only Mr. White could have placed the gun in the glove box do not, however, flow from the three items of officer testimony the *White II* panel describes. The "conclusions drawn" instead come from Ms. Vierzba's trial testimony—trial testimony that could have been substantially impeached by evidence of Ms. Vierzba's terroristic threats conviction and resulting lifetime firearms-possession ban. In addition, Ms. Vierzba's appearance of upset could take on new meaning, had the jury been told she was banned from possessing a firearm.

The *White II* panel continued by writing that "the officers' testimony provides additional corroborating evidence to support her testimony at trial." *White II*, 2021 WL 5441783, at *5. But the court then significantly undercut that conclusion by stating, "The fact that [Ms. Vierzba] could have been charged with a crime *different than the one White identified on direct appeal* does not change the analysis." *Id.* (emphasis added). Respectfully, that fact not only changes the analysis, it reverses the analysis. The crime with which Ms. Vierzba could have been charged, identified by Mr. White on postconviction review, was the very same crime with which Mr. White was charged, and the possibility of charging Ms. Vierzba with that very same crime flowed from the lifetime ban on firearms possession which her terroristic threats conviction—a conviction that the State did not disclose—carried.

The court of appeals also wrote that even if Ms. Vierzba's terroristic threats conviction had been disclosed and used at trial, that would not have "disprove[d]" possession of the gun by Mr. White. *White II*, 2021 WL 5441783, at *5. It is unclear what

the court of appeals meant by this. It was not Mr. White's obligation to "disprove" anything, it was the State's burden to prove Mr. White guilty beyond a reasonable doubt.

The record is mixed concerning whether Mr. White's trial strategy was oriented towards portraying Ms. Vierzba as an alternative perpetrator or an accomplice. Trial defense counsel conceded that, at different times during trial and in pretrial briefing on a motion to suppress evidence, she asserted that the gun could have been Ms. Vierzba's. Trial defense counsel later explained that such statements should be understood within a broader trial strategy of creating reasonable doubt that the gun was Mr. White's by pointing out that the gun could have belonged to someone else. (There was, for example, DNA from at least five people on the gun's magazine and slide.) Trial defense counsel's statements about Ms. Vierzba owning the gun were also meant to cast doubt on the thoroughness of law enforcement's investigation. This Court understands trial defense counsel to be critical of law enforcement in what she tried to portray as their credulous acceptance of Ms. Vierzba's disclaimer of ownership of the gun (even though it was found in her vehicle), which resulted in an immediate investigative focus on Mr. White and a truncated or nonexistent consideration of the possibility that the gun belonged to someone else, including Ms. Vierzba.

Given the record, particularly the tentative manner in which trial defense counsel raised the possibility that the gun belonged to Ms. Vierzba, the question is not free from doubt, but on balance the Court finds that Mr. White's trial defense counsel cast Ms. Vierzba as an alternative perpetrator, not an accomplice. What can be said is that had trial defense counsel been fully informed of Ms. Vierzba's terroristic threats conviction and

resultant lifetime firearms ban, counsel would have known that a strategy she did not know was an option at the time—assertively portraying Ms. Vierzba as the possessor of the firearm—was viable. The trial prosecutor conceded in his testimony during the postconviction evidentiary hearing that if the lifetime ban on firearms possession was retroactive (it was) Ms. Vierzba could have been charged with the same crime as Mr. White. Trial defense counsel would have been at liberty to vigorously cross-examine Ms. Vierzba with her terroristic threats conviction and her lifetime ban on firearm possession, and to argue to the jury that Ms. Vierzba was the owner of the gun, that Ms. Vierzba had a reason to lie about the gun, and that Ms. Vierzba was untrustworthy.

This is, at bottom, a case in which two people are in a car, both with access to the glovebox, both barred for life from owning a firearm. The information about Ms. Vierzba's criminal record and resultant lifetime ban on firearms possession should have been presented to the jury. If it had been, there was a reasonable probability that "the result of the proceeding would have been different." *See Cone v. Bell*, 556 U.S. 449, 469–470 (2009). Because of the State's nondisclosure, this Court's "confidence in the outcome of the trial" has been "undermined." *See Kyles v. Whitley*, 514 U.S. 419, 434 (quoting *Bagley*, 473 U.S. at 678).

### 2. Nondisclosure of Ms. Vierzba's Probationary Status

Mr. White argued to the Minnesota Court of Appeals that the prosecution violated *Brady* by failing to disclose that Ms. Vierzba was on probation. *See White II*, 2021 WL 5441783, at *6. The Minnesota Court of Appeals recognized that "[a] witness may be questioned about their probationary status to reveal the existence of a reason to lie or to

otherwise show bias." *Id.* However, the *White II* panel faulted Mr. White for—purportedly—failing to argue that the outcome of the trial would have been different, and thus the panel "discern[ed] no prejudice to White." *Id.* The court also found Ms. Vierzba's testimony about her probation status only "arguably inaccurate," given evidence that "she was not on supervised probation and was not required to check in with a probation officer." *Id.*

The Court concludes that this aspect of the Minnesota Court of Appeals' decision was unreasonable. The nondisclosure of Ms. Vierzba's probationary status was material. Whether or not she was on "supervised probation" or "required to check in with a probation officer," it is undisputed that she was on probation at the time of trial. (*See* Resp't's App. Ex. 8 at 5); *see White II*, 2021 WL 5441783, at *6. The court of appeals characterized Ms. Vierzba's testimony that she was not on probation as "not entirely accurate," when, actually, it was false. As *White II* acknowledged, Mr. White would have been allowed to question Ms. Vierzba about her probationary status to show bias or a reason to lie. *Id.* Mr. White also could have used evidence of Ms. Vierzba's probationary status to impeach her testimony that she was not on probation. The evidence was therefore material.

Finally, Mr. White *did* argue to the court of appeals that there was a reasonable probability that the outcome of his trial would have been different if the evidence of Ms. Vierzba's probationary status had been disclosed. (Resp't's App. Ex. 9 at 38–39.) It was unreasonable for the court of appeals to rest its decision about Ms. Vierzba's probationary status on Mr. White's failure to make an argument, *see White II*, 2021 WL 5441783, at *6, when he had.

### 3.    The Prosecution's Use of and Failure to Correct False Testimony

Although Mr. White's false-testimony argument would seem to fall under the umbrella of prosecutorial misconduct, the Supreme Court has recognized that a prosecutor's failure to correct the false testimony of a witness, which the prosecutor knows to be false, violates due process. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). This is true whether the prosecutor solicits false testimony or "allows it to go uncorrected when it appears." *Id.* When false testimony "may have had an effect on the outcome of the trial," the judgment must be reversed. *Id.* at 272; *see also United States v. Agurs*, 427 U.S. 97, 103 (1985) ("[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair,[] and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.").[17] "A finding of materiality of the evidence is required under *Brady*," and "[a] new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'"

---

[17] Although *Brady* does not require that a witness who testifies falsely know the falsity of their testimony (the violation is the prosecutor's, not the witness's), both the district court and the court of appeals wondered whether Ms. Vierzba knew she was on probation, given that there appeared to be no conditions associated with her "probation to the court." The prosecutor testified at the postconviction hearing that Ms. Vierzba believed she was not barred from possessing a firearm and that he agreed with her. The state of Ms. Vierzba's knowledge about these two topics is a question of fact, to be inquired into at a retrial (if there is one). Furthermore, it is highly likely that either the prosecutor before trial, or Mr. White's counsel during trial, would have informed Ms. Vierzba about her probationary status, if the prosecutor had disclosed it to Mr. White before trial. What is not disputed, however, is that the prosecutor knew Ms. Vierzba was on probation, heard her testify, when she was questioned by Mr. White's lawyer, that she was not, and yet did nothing. It is also not in question that the prosecutor elicited from Ms. Vierzba testimony that she was "not ineligible" to possess a firearm and not only allowed that testimony to stand but then used it in his closing argument.

*See Giglio v. United States*, 405 U.S. 150, 153–54 (quoting *Napue*, 360 U.S. at 271) (ellipses in *Giglio*).

"To establish a due process violation based on the prosecutorial use of false testimony, a defendant must show that '(1) the prosecution used [false] testimony; (2) the prosecution should have known or actually knew of the [falsity]; and (3) there was a reasonable likelihood that the [false] testimony could have affected the jury's verdict.'" *United States v. Bass*, 478 F.3d 948, 951 (8th Cir. 2007) (quoting *United States v. Funchess*, 422 F.3d 698, 701 (8th Cir. 2005)). "[T]he *Agurs* standard for evaluating the materiality of the Government's knowing use of perjured testimony is less onerous . . . than the standard of materiality for a general *Brady* violation." *United States v. Clay*, 720 F.3d 1021, 1026 (8th Cir. 2013). A reviewing court "must evaluate the reasonable impact of the omitted evidence, and the government's misleading closing argument, on the jury verdict." *United States v. Bigeleisen*, 625 F.2d 203, 208 (8th Cir. 1980).

The false testimony at issue is Ms. Vierzba's testimony that she was not prohibited from possessing a firearm and was not on probation. The Minnesota Court of Appeals determined that the testimony, if corrected, "would not have led a jury to reach a different result . . . ." *White II*, 2021 WL 5441783, at *8. This determination rests upon the evidence that was introduced at trial to convict Mr. White but does not take into account that Mr. White's trial counsel would have presented evidence of Ms. Vierzba's criminal history, probationary status, and firearms ban to the jury. Thus, there was a reasonable likelihood that the evidence would have affected the jury's verdict. Again, bootstrapping Ms. Vierzba's testimony into the calculus of whether her testimony, plus other testimony,

34

would have been sufficient to convict Mr. White, rather than disregarding Ms. Vierzba's testimony in the calculus, was unreasonable.

### B.    Ineffective Assistance of Counsel Based on Failure to Identify and Use Ms. Vierzba's Criminal History

The Court has recommended that Mr. White's habeas petition be granted due to the *Brady* and *Giglio* violations. None of his remaining grounds, however, would entitle him to relief. The Court now explains why, in turn.

Mr. White contends his trial and appellate counsel were ineffective because they failed to identify and use Ms. Vierzba's criminal history in his defense at trial and on appeal. (Pet. at 8.) He raised this issue in his petition for postconviction relief (Resp't's App. at 3, Dkt. No. 11-7), to the Minnesota Court of Appeals (Resp't's App. at 48–50, Dkt. No. 11-9), and in his Petition for Review of Decision of Court of Appeals filed in the Minnesota Supreme Court (Resp't's App. at 2, Dkt. No. 11-15).

### 1.    Exhaustion and Procedural Default

Warden Pugh suggests that Mr. White "arguably" failed to present his claim through an entire round of state appellate review because he did not include facts or legal argument for his ineffective-assistance claims in his petition for review by the Minnesota Supreme Court. (Resp't's Resp. at 22–23, Dkt. No. 10.) Warden Pugh concedes, however, that the petition referenced *Strickland*. (*Id.* at 23.)

A § 2254 petition may not be granted unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). To exhaust state-court remedies, a prisoner "must 'fairly present' his claim in each appropriate state court

(including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (quoting *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995) (per curiam)). A state prisoner who may eventually seek federal habeas relief "can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Id.* at 32.

Mr. White's Petition for Review of Decision of Court of Appeals reads in relevant part: "Issue 2: Whether White's Sixth Amendment and *Strickland v. Washington*, 466 U.S. 668, 687 (1984) ineffective assistance of counsel claims based on trial and appellate counsels' failure to identify and use [Ms. Vierzba's] criminal history in White's defense, can be denied?" (Resp't's App. at 2, Dkt. No. 11-15) (emphasis omitted). This statement references both a federal constitutional provision and the Supreme Court authority governing federal ineffective assistance of counsel claims. The Court finds that Mr. White adequately alerted the Minnesota Supreme Court to the presence of a federal claim, and the ineffective assistance claim is exhausted.

### 2.    *Strickland*

Under *Strickland v. Washington*, 466 U.S. 668 (1984), a habeas petitioner who claims ineffectiveness of counsel must demonstrate both that counsel's performance was deficient and that he was prejudiced by the deficiency. *Id.* at 692. The proper measure of attorney performance remains simply reasonableness under prevailing professional norms. *Id.* at 688. Reasonableness is "viewed as of the time of counsel's conduct," not in hindsight.

*Id.* at 690. An attorney's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," whereas "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91. Counsel's "particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691. But even when an error is professionally unreasonable, setting aside the judgment is not warranted if the error did not affect the outcome. *Id.* The test for prejudice requires the defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

In *Strickland*, the defendant's counsel spoke on the telephone (but did not meet) with the defendant's wife and mother in preparing for a sentencing hearing. *Id.* at 672–73. Counsel also did not seek out other character witnesses or look for additional character or emotional-state evidence. *Id.* at 673. Counsel's strategy was affected by a sense of hopelessness created by the defendant's confession and counsel's judgment that it was acceptable to rely on the plea colloquy for the defendant's background and emotional state. *Id.* Counsel did not ask for a presentence report because it "might prove more detrimental than helpful, as it would have included [the defendant's] criminal history." *Id.* After the defendant was sentenced, he sought collateral relief for, in part, ineffective assistance of counsel. *Id.* at 675 (asserting ineffectiveness because counsel "failed to move for a continuance to prepare for sentencing, to request a psychiatric report, to investigate and

present character witnesses, to seek a presentence investigation report, to present meaningful arguments to the sentencing judge, and to investigate the medical examiner's reports or cross-examine the medical experts").

The Supreme Court found, as to the performance question, that counsel made a strategic choice "well within the range of professionally reasonable judgments," and his sense of hopelessness did not distort his judgment. *Id.* at 699. As to prejudice, the evidence that defendant wanted his lawyer to offer "would barely have altered the sentencing profile" and may have even been harmful. *Id.* at 699–700.

The question for this Court, on habeas review, is not whether "the state court's determination under the *Strickland* standard was incorrect but whether the determination was unreasonable—a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (cleaned up). "A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). Thus, the Court undertakes a "doubly deferential judicial review." *Knowles*, 556 U.S. at 123.

The state postconviction court held an evidentiary hearing and heard testimony from Mr. White's trial counsel, Mr. White's appellate counsel, the prosecutor, and Mr. White, in addition to several others. (*See* Resp't's App. at 2, Dkt. No. 11-8.) The court also accepted several exhibits documenting Ms. Vierzba's convictions of making terroristic threats, DWI, possession of marijuana, and theft. (*Id.* at 2–3.)

The state postconviction court made the following findings of fact concerning Mr. White's ineffective-assistance-of-trial-counsel claims:

- Trial counsel learned of Ms. Vierzba's misdemeanor terroristic threat conviction after the trial.

- Trial counsel believed at the time of trial that a condition of Ms. Vierzba's probation was not to possess a firearm for ten years, but did not know that Ms. Vierzba was on probation at the time of trial.

- Trial counsel did not investigate Ms. Vierzba's criminal history because Ms. Vierzba was Mr. White's only trial witness, and counsel did not want to have to disclose any history to the prosecutor and risk Ms. Vierzba being impeached.

- Mr. White's trial attorney did not want to impeach Ms. Vierzba because the defense needed Ms. Vierzba's testimony that she never saw Mr. White possess the firearm or open the glovebox.

- Mr. White and his trial attorney discussed and agreed on a theory that there was insufficient evidence to determine who placed the firearm in the glovebox.

- Counsel argued that the firearm could have belonged to Ms. Vierzba or others in her closing argument.

(*Id.* at 7–8.)

The court determined that trial counsel's representation was objectively reasonable because she made the necessary demands for disclosure, reviewed all of the evidence provided, hired a private detective to investigate Ms. Vierzba's jail phone calls (at Mr. White's request), and discussed the case and trial strategy with Mr. White. (*Id.* at 24.) The court further determined that Mr. White had not shown that, but for his counsel's alleged errors, the result of his trial would have been different. (*Id.* at 25.) Ms. Vierzba was listed as a witness for the State, as well as for the defense. (*Id.*) Thus, Mr. White's trial counsel had to minimize any negative testimony from Ms. Vierzba elicited in the State's case-in-chief, while maximizing Ms. Vierzba's testimony that was favorable to him. (*Id.*) Ms. Vierzba offered favorable testimony such as that she never saw Mr. White with the firearm and never saw him open the glovebox, and she "[swore] on her dead mother's grave" that the firearm was not Mr. White's. (*Id.*) As trial counsel testified, it would not have made

sense—on the state of the evidence as trial counsel understood it at trial, which of course turned out to be a materially incomplete understanding—for her to impeach Ms. Vierzba after eliciting this testimony. (*Id.*) Thus, the postconviction court concluded, even if trial counsel had learned of Ms. Vierzba's criminal history and put it into evidence, Mr. White had not shown the outcome of the trial would have been different. (*Id.*)

The state postconviction court made the following findings of fact concerning Mr. White's ineffective-assistance-of-appellate-counsel claims:

- Appellate counsel discussed Ms. Vierzba's credibility with Mr. White and told him the appellate court would accept her testimony as credible under the applicable standard of review.
- Appellate counsel did not know about Ms. Vierzba's criminal history during his representation of Mr. White. Counsel learned about Ms. Vierzba's misdemeanor theft convictions after Mr. White's direct appeal.
- Appellate counsel would have pursued postconviction relief if he had known about Ms. Vierzba's past criminal history.

(*Id.* at 9–10.)

The court dismissed the ineffective-assistance-of-appellate-counsel claim because there was no evidence that counsel's representation fell below an objective standard of reasonableness. (*Id.* at 17.) Appellate counsel met with Mr. White, discussed the issues to be raised on appeal, reviewed the entire trial record, provided information on request to Mr. White, told Mr. White he could file a pro se brief to supplement counsel's brief, and raised what he considered to be the best arguments for reversal. (*Id.*) Furthermore, the postconviction court concluded, appellate counsel do not reopen discovery issues. (*Id.* at 17.)

The Minnesota Court of Appeals affirmed the denial of postconviction relief. *White II*, 2021 WL 5441783, at *1. The court accepted that trial counsel made a tactical decision to preserve Ms. Vierzba's credibility because Ms. Vierzba was the only witness who testified that Mr. White did not possess the gun, and that trial counsel purposely chose not to investigate Ms. Vierzba's criminal history because she did not want to disclose that history to the prosecution and risk the impeachment of her only favorable witness.[18] *Id.* at *7. "This reasonable trial strategy did not constitute representation that fell below an objective standard of reasonableness." *Id.* Further, the appellate court decided, the nondisclosure did not prejudice Mr. White because he had not shown the outcome of the trial would have been different. *Id.* This component of the court of appeals' decision must be re-evaluated in light of the fact that investigation of Ms. Vierzba's criminal record would have led to discovery of Ms. Vierzba's terroristic threats conviction, and the consequential ban on Ms. Vierzba possessing a firearm for life. This would have raised the possibility that Ms. Vierzba was an accomplice and that unless Mr. White chose to paint Ms. Vierzba as an alternative perpetrator the jury must be instructed to disregard her testimony in the absence of sufficient corroboration. However, before the question of whether there was prejudice can be analyzed, a shortcoming in trial counsel's work, sufficient to fail even the *Strickland* standard, must be found. Courts do not evaluate whether counsel's reasonable tactical decisions caused prejudice, they evaluate only whether counsel's unprofessional, ineffective failures cause prejudice. Here, there is no failure, and there will therefore be no

---

[18] As events have shown, of course, the prosecution was aware of Ms. Vierzba's criminal history and chose not to make use of it.

analysis of prejudice. Mr. White contends that his trial counsel acted unreasonably in failing to discover and use Ms. Vierzba's criminal history. (Pet'r's Mem. Supp. at 63, Dkt. No. 3.) The question for this Court is not whether counsel acted unreasonably, but whether the state courts' determinations under *Strickland* were reasonable. The Court finds they were.

With respect to Mr. White's appellate counsel, the Minnesota Court of Appeals observed that Mr. White cited no legal authority to support his position that "appellate counsel is required to undertake a fact-finding mission to discover evidence not contained in the record." *Id.* at *7. In addition, appellate counsel's failure to raise a claim relating to the legality of Mr. White's arrest had no effect on the outcome of the direct appeal because the Minnesota Court of Appeals had concluded on direct appeal that Mr. White's "arrest did not lead the police to search the vehicle, and the search did not lead the police to arrest" Mr. White. *Id.* (quoting *White I*, 2020 WL 132523, at *4).

The postconviction district court and appellate court considered the entire record, including the evidentiary record developed in the postconviction proceeding. Both the postconviction trial court and appellate court assessed Mr. White's arguments under the two *Strickland* prongs. Those courts determined that Mr. White had not shown that his trial counsel's or appellate counsel's performance was unreasonable. With respect to Mr. White's trial counsel, the state courts found reasonable counsel's explanation that she made a tactical decision not to investigate Ms. Vierzba's criminal history to protect the credibility of her only witness. Though Mr. White suggests that trial counsel's arguments during the trial contradicted her later position that Ms. Vierzba was a favorable witness (Pet'r's Reply

at 16–18, Dkt. No. 12), his disagreement with the findings and conclusions of the state courts on that point does not mean the state courts unreasonably applied or refused to extend *Strickland*.

Mr. White still has not shown that appellate counsel must engage in independent factfinding or that counsel's failure to do so was unreasonable. Accordingly, he is not entitled to habeas relief on this claim.

### C.    Ineffective-Assistance-of-Counsel Claim Based on Failure to Argue that Police Unlawfully Expanded the Scope and Duration of Mr. White's Arrest

The Court turns now to an ineffective-assistance argument Mr. White made in the memorandum filed in support of his Petition, but not in the Petition itself. Mr. White argues in the memorandum that his trial and appellate counsel were ineffective for failing to "properly" argue that police had unlawfully expanded the scope and duration of his arrest in violation of Minnesota Rule of Criminal Procedure 6.01. (*See* Pet. at 8–10; Pet'r's Mem. Supp. at 65, 67.)

### 1.    Exhaustion and Procedural Default

Mr. White raised this particular ineffective assistance claim in his postconviction petition (Resp't's App. at 3, Dkt. No. 11-7) and to the Minnesota Court of Appeals in his appeal of the denial of the postconviction petition (Resp't's App. at 51–53, Dkt. No. 11-9), but he did not raise it in his petition for review by the Minnesota Supreme Court (Resp't's App. at 1–15, Dkt. No. 11-15).[19] The only *Strickland* claim Mr. White raised in that petition

---

[19] Perhaps this is why Mr. White did not make this claim in the habeas Petition itself.

for review was "failure to identify and use [Ms. Vierzba's] criminal history in White's defense." (Resp't's App. at 2, Dkt. No. 11-15.) Mr. White did not argue that counsel was ineffective with respect to Minnesota Rule of Criminal Procedure 6.01 or the legality of his arrest. (*See generally* Resp't's App., Dkt. No. 11-15.) Mr. White seems to concede as much in his reply memorandum, in which he describes his ineffective-assistance claim to the Minnesota Supreme Court only as "trial and appellate counsels' failure to identify and use [Ms. Vierzba's] criminal history in his defense." (Pet'r's Reply at 3.)

A federal "habeas claim need not be an 'exact duplicate' of the one raised in the state court proceedings, . . . but the petition must present the same legal and factual bases to the federal courts that were presented to the state courts." *Ward v. Norris*, 577 F.3d 925, 935 (8th Cir. 2009) (quotation omitted). Although a "federal claim cannot contain 'significant additional facts such that the claim was not fairly presented to the state court,' . . . closely related claims containing an 'arguable factual commonality' may be reviewed." *Anderson v. Groose*, 106 F.3d 242, 245 (8th Cir. 1997) (quotation omitted).

In *Ward*, the petitioner's habeas claim was that his counsel was ineffective for failing to seek recusal of the trial judge. 577 F.3d at 935. The petitioner argued to the state courts and the federal district court that the judge showed bias by allowing the prosecution more opportunities to approach the bench. *Id.* On appeal to the Eighth Circuit, the petitioner added "additional factual bases" for judicial bias that had not been presented to the state courts or the federal district court. *Id.* The Eighth Circuit held that the petitioner was "attempting to broaden impermissibly his ineffective assistance of counsel claim to include factual bases not raised before both the state courts and the district court." *Id.*

44

In *Anderson*, the petitioner claimed ineffective assistance of counsel based on his lawyer's failure to pursue an alibi witness named Brian Nunnally. 106 F.3d at 244–45. He presented the claim to the postconviction district court, but in his appeal to the state appellate court, he presented the issue as whether, "by precluding Nunnally's testimony, the trial court's rulings denied Appellant's rights to the effective assistance of counsel." *Id.* (cleaned up). The habeas claim before the Eighth Circuit was whether counsel was ineffective, not whether the trial court had prevented counsel from being effective. *Id.* "These are two distinct legal theories, with distinct factual arguments." Nonetheless, the court gave the petitioner the benefit of the doubt and "conclude[d] there may be an 'arguable factual commonality' between Anderson's ineffective assistance of counsel claim on appeal to the state court and his ineffective assistance claim in this action." *Id.*

As presented by Mr. White in his petition for review by the Minnesota Supreme Court, "Issue 3" was:

> Whether White's Rule 6.01 and Probable Cause-based arguments lacked merit.

> Decision Below: The Court of Appeals held White wasn't entitled to relief because the claims were waived as not raised on direct appeal despite the claims being based on evidence of [Ms. Vierzba's] criminal history, which wasn't known to White at the time of trial.

(Resp't's App. at 2, Dkt. No 11-15.) The rest of the petition for review focused exclusively on Ms. Vierzba's criminal history and trial testimony. (*Id.* at 2–15.) There is no mention of Rule 6.01, illegal arrest, or even ineffective assistance of counsel (other than the passing reference to *Strickland* with respect to Ms. Vierzba's criminal history) in the petition for review. The Court concludes that Mr. White did not fairly present to the Minnesota

Supreme Court the substance of the ineffective-assistance claim based on counsel's failure to argue a violation of Rule 6.01 or unlawful arrest. As to this ineffective-assistance claim, there is no arguable factual or legal commonality between his petition for review by the Minnesota Supreme Court and his federal habeas petition. Mr. White's petition for review did not claim ineffective assistance with respect to Rule 6.01 or the legality of his arrest, nor did that filing set forth any factual basis for a Rule 6.01 violation or illegal arrest.

"A claim that is presented to the state court on a motion for post-conviction relief is procedurally defaulted if it is not renewed in the appeal from the denial of post-conviction relief." *Anderson*, 106 F.3d at 245. Mr. White did not renew in his petition for review by the Minnesota Supreme Court the claim that his trial and appellate counsel were ineffective for failing to raise the Rule 6.01 or illegal-arrest arguments. Consequently, he did not fairly present that claim to the state courts.

Where a petitioner's federal claim was not fairly presented on direct appeal to the state courts, a federal court sitting in habeas must determine whether a petitioner could still obtain a decision on the merits of his claim in state court. *See McCall v. Benson*, 114 F.3d 754, 757 (8th Cir. 1997). If the state's procedural rules bar a petitioner from requesting a ruling on the merits of their federal claim, that claim is considered procedurally defaulted. *See id.* A federal court may not entertain a habeas petition for a procedurally defaulted claim unless the petitioner shows cause for the default and establishes that he suffered actual prejudice caused by the alleged violation of federal law, or shows that a fundamental miscarriage of justice would result if his claim is not considered. *See id.*

The Court finds that Mr. White does not have the option to return to the Minnesota Supreme Court to fairly present this ineffective-assistance claim. Any attempt to do so would be unavailing because, under Minnesota state law, "matters raised or known but not raised in an earlier petition for postconviction relief will generally not be considered in subsequent petitions for postconviction relief." *Powers v. State*, 731 N.W.2d 499, 501 (Minn. 2007). This includes a ground for relief presented originally in a postconviction petition but not presented to the Minnesota Supreme Court. *Odell v. Minnesota*, No. 19-CV-3195 (NEB/HB), 2020 WL 2735708, at *4 (D. Minn. Mar. 16, 2020), *R. & R. adopted*, 2020 WL 2733788 (D. Minn. May 26, 2020). Therefore, the Court finds that Mr. White has procedurally defaulted on his ineffective-assistance claim that his trial and appellate counsel were ineffective for failing to challenge the scope and duration of his arrest.

Mr. White makes no argument showing why he was unable to raise this claim to the Minnesota Supreme Court. Thus, he has failed to show cause for the default, and the Court need not proceed to consider prejudice. The fundamental miscarriage of justice exception "is only available to a petitioner who demonstrates that a constitutional violation has probably resulted in the conviction of one who is actually innocent." *McCall*, 114 F.3d at 758. Mr. White has not argued that he was actually innocent. Consequently, the Court cannot review the procedurally defaulted claim on the merits.

### 2.    *Strickland*

Alternatively, to the extent Mr. White's procedurally defaulted ineffective-assistance claim could be considered to have an "arguable factual commonality" with his exhausted ineffective-assistance claim, the claim should be denied on the merits. Mr. White

has not demonstrated that his trial or appellate counsel acted unreasonably or that he was prejudiced by their conduct.[20] Mr. White's argument appears[21] to be that trial counsel should have challenged the search of Ms. Vierzba's vehicle on the basis that Mr. White was illegally arrested, and that but for the illegal arrest, Mr. White would have been a passenger in Ms. Vierzba's vehicle and thus would have had standing to challenge the search. (Pet. at 10, Pet'r's Mem. Supp. at 67.) This argument ignores, however, the following facts: the police wanted to talk to Willie White, who was getting into Ms. Vierzba's vehicle when the police encountered him; Ms. Vierzba willingly pulled over and parked her car; the police noticed a strong odor of marijuana coming from the car; and Ms. Vierzba consented to the search of the car. *White I*, 2020 WL 132523, at *1. Even if Mr. White's arrest was illegal, the officers' desire to speak with Willie White, Ms. Vierzba's actions in pulling over and parking the car, the smell of marijuana, and Ms. Vierzba's consent to the search had nothing to do with Mr. White's arrest. As the Minnesota Court of Appeals stated: "Police required no justification for searching the vehicle other than Ms. Vierzba's voluntary consent." *Id.* at *4.[22] Further, the appellate court quite clearly

---

[20] The Court does not examine the reasonableness of the state courts' determination of this issue because the state courts did not directly address this iteration of Mr. White's ineffective-assistance claim.

[21] Since this particular ineffective-assistance claim is not advanced clearly in the Petition itself, the Court has attempted to glean the precise nature of the claim from Mr. White's other arguments and filings.

[22] "The driver of a car has the authority to consent to a search of that vehicle." *United States v. Eldridge*, 984 F.2d 943, 948 (8th Cir. 1993). The driver has "immediate possession of and control over the vehicle" and may consent to a search of the entire vehicle or its components, such as a glovebox. *Id.* (citation omitted). "This is true even when some other

explained that Mr. White's "arrest was entirely independent of the search. His arrest did not lead the police to search the vehicle, and the search did not lead the police to arrest appellant."[23] *Id.*

Circling back to the context of this argument—that Mr. White's trial counsel was ineffective for not challenging the scope and duration of his arrest—the Court finds it was not unreasonable for trial counsel not to make this argument for the very reasons enunciated by the Minnesota Court of Appeals: Ms. Vierzba consented to the search of her vehicle, which was all the authorization that police needed to conduct the search, and Mr. White's arrest was completely independent of the search. And even if trial counsel had challenged the scope and duration of the arrest, the result of the proceeding would not have been different. Given Ms. Vierzba's consent to the search, and the unrelatedness of Mr. White's arrest to the search of the car, the gun recovered from the glovebox would not have been suppressed on the basis of Mr. White's illegal arrest. Mr. White identifies no other argument for suppression that trial counsel should have made.

By extension, since trial counsel was not ineffective for not challenging the scope and duration of Mr. White's arrest, appellate counsel was not ineffective for failing to raise this particular theory of ineffectiveness of trial counsel on appeal.

---

person who also has control over the car is present, if the other person remains silent when the driver consents and does not object to the search." *Id.* (citations omitted).

[23] The search eventually led to Mr. White being charged with the crime of conviction, but his initial arrest was for violation of a noise ordinance due to his shouting at Officers Bunde and Waaraniemi.

### D.    Illegal Search and Seizure

Mr. White contends he was unlawfully searched and seized when he was arrested for a misdemeanor offense, and that he was denied an opportunity to challenge the search of the vehicle from which the gun was seized because the state courts found he was not a passenger in the vehicle at the time of the search. (Pet. at 10.) The clearly established federal law on which Mr. White relies is the Fourth Amendment of the United States Constitution and *Arizona v. Gant*, 556 U.S. 332 (2009).

In *Stone v. Powell*, 428 U.S. 465, 489 (1976), the Supreme Court considered "whether state prisoners who have been afforded the opportunity for full and fair consideration of their reliance upon the exclusionary rule with respect to seized evidence by the state courts at trial and on direct review may invoke their claim again on federal habeas corpus review." The Court held they could not. *Id.* at 494 ("[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim,[] a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."). A federal habeas petitioner's Fourth Amendment claim is barred by *Stone* "and thus unreviewable by a federal habeas court, unless either the state provided no procedure by which the prisoner could raise his Fourth Amendment claim, or the prisoner was foreclosed from using that procedure because of an unconscionable breakdown in the system." *Willett v. Lockhart*, 37 F.3d 1265, 1273 (8th Cir. 1994). Federal habeas courts "are not to consider whether full and fair litigation of the claims *in fact* occurred in the state courts, but only whether the state provided an opportunity for such litigation." *Id.* (emphasis in original).

Mr. White had a full and fair opportunity to litigate his search-and-seizure claim in state court. Indeed, he moved to suppress the evidence of the gun, and the trial court denied the motion upon finding that Mr. White's Fourth Amendment rights were not implicated and, in the alternative, that Ms. Vierzba consented to the search. *See White I*, 2020 WL 132523, at *1. The Minnesota Court of Appeals also considered Mr. White's Fourth Amendment claim and rejected it. *Id.* at *3. Mr. White has not shown that the State provided no corrective procedures to address his claim or that he was prevented from using the procedures due to an unconscionable breakdown in the process. Consequently, Mr. White's Fourth Amendment claim is not cognizable on federal habeas review.

With respect to Mr. White's reliance on *Arizona v. Gant*, Mr. White has not shown he was denied a full and fair opportunity to raise the corresponding argument in the state courts. To the contrary, Mr. White cited *Gant* in his pro se supplemental brief to the Minnesota Court of Appeals on direct appeal (Resp't's App. at 15, Dkt. No. 11-2) and in his amended petition for review by the Minnesota Supreme Court (Resp't's App. at 12, Dkt. No. 11-6).

To the extent Mr. White relies on Minnesota Rule of Criminal Procedure 6.01 to challenge the legality of the search and seizure (*see* Pet'r's Mem. at 67–68), that rule is a state procedural rule, not clearly established federal law, and thus not a basis for federal habeas relief.

Finally, Mr. White suggests in his reply memorandum that he raised his Fourth Amendment claim "in the context of an ineffective assistance of counsel claim for counsel failing to properly raise the claim," not as a standalone claim. (Pet'r's Reply at 18.) The

Court generally does not consider arguments made for the first time in a reply brief. *Cotten v. Miller*, No. 20-cv-1588 (JRT/JFD), 2022 WL 3141917, at *7 (D. Minn. Aug. 5, 2022). And even if the Court were so inclined, Mr. White has not shown that he fairly presented this particular iteration of his ineffective-assistance claim to each level of the state courts, that the claim is not procedurally defaulted, or that the procedural default should be excused.

### E.    Probable Cause to Hold for Trial

Mr. White argues that his case would have been dismissed for lack of probable cause if the trial court had known of Ms. Vierzba's criminal history. (Pet'r's Mem. at 76.) He identifies no federal law in support of this claim. Mr. White contends in his reply memorandum that this ground for relief was not intended to be a standalone claim, but as part of his ineffective assistance of counsel claim. (Pet'r's Reply at 19.) The Court does not consider arguments made for the first time in a reply brief. *See Cotten*, 2022 WL 3141917, at *7. And even if the Court were so inclined, Mr. White has not shown that he fairly presented this particular iteration of his ineffective-assistance claim to each level of the state courts, that the claim is not procedurally defaulted, or that the procedural default should be excused.

### F.    Illegal Arrest

Most of Mr. White's arguments concerning the legality of his arrest are made as part of his illegal-search-and-seizure claim or his ineffective-assistance of counsel claim. (*See* Pet. at 10, Pet'r's Mem. at 65–76.) The Court has already considered and rejected these arguments. Mr. White also states in his memorandum, however, that he is entitled to habeas

relief directly because of an unlawful arrest. (*Id.* at 76.) Other than *Gant*, which the Court discussed above, Mr. White relies on state law, which does not provide a basis for federal habeas relief.

### G.    State Courts' Determination of Facts

Mr. White argues that the state courts made the following unreasonable determinations of fact: (1) "failed to conclude that [Ms. Vierzba] was permanently ineligible to possess a firearm," (2) "concluded that [Ms. Vierzba] was not on probation," and (3) "conclude[ed] that Mr. White was not prejudiced by the prosecution's failure to disclose evidence showing that [Ms. Vierzba] had many convictions, including one for a crime of violence that rendered her permanently ineligible to possess a firearm and was on probation on at least two cases." (Pet. at 14.)

The Court disagrees. Although this Court has recommended granting relief on the *Brady* and *Giglio* violations, it must be clearly distinguished that this Court recommends granting relief for the materiality of the State's failure to disclose, not for the state courts' factual determinations. Furthermore, the state courts did not make the factual determinations Mr. White now complains of. First, the postconviction state district court acknowledged that "the change in the applicable statute . . . changed Ms. Vierzba's prohibition to a lifetime prohibition to carry a firearm." (Resp't's App. Ex. 8, at 22–23.) Second, no state court concluded that Ms. Vierzba was not on probation. Indeed, the Minnesota Court of Appeals acknowledged that "Ms. Vierzba was on probation to the court for two different offenses." *White II*, 2021 WL 5441783, at *6. Third, and finally, the state courts' conclusion that Mr. White was not prejudiced was not a determination of fact but a

question of law. *See United States v. Straker*, 800 F.3d 570, 603 (D.C. Cir. 2015). This issue has been fully dealt with by this Court's recommendation of relief for a *Brady* violation.

## IV.    CONCLUSION

The Court recommends that a writ of habeas corpus issue. Mr. White, because of the prosecution's failure to meet *Brady/Giglio* disclosure obligations that are of constitutional seriousness, did not get a fair trial, and the state appellate courts unreasonably applied governing precedent from the U.S. Supreme Court when they denied Mr. White relief on the grounds that these disclosure violations were not material. Because of this, a writ of habeas corpus should issue.

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.  Mr. White's Petition for a Writ of Habeas Corpus (Dkt. No. 1) be **GRANTED**;

2.  Mr. White be released from custody unless the State of Minnesota moves to retry him within 60 days of the District Court's judgment in this case; and

3.  Judgment be entered accordingly.

Date: June 27, 2023                          *s/ John F. Docherty*
                                             JOHN F. DOCHERTY
                                             United State Magistrate Judge

## NOTICE

**Filing Objections:** The Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed find and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).